Ronald A. Offret
Attorney for Defendant Gerald Drew
AGLIETTI, OFFRET & WOOFTER
733 West 4th Avenue, Suite 206
Anchorage, Alaska 99501
(907) 279-8657 – Telephone
(907) 279-5534 - Fax

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br><br>vs.<br><br>JUANITA HARRIS and<br>GERALD DREW,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

No. 3:06-cr-00061 RRB

**MEMORANDUM IN SUPPORT OF MOTION TO SUPPRESS EVIDENCE and TO DISMISS INDICTMENT**

COMES NOW DEFENDANT GERALD DREW, through counsel and files this memorandum in support of Defendant Drew's motion to suppress evidence and his motion to dismiss the indictment filed against him.

### THE COURT SHOULD SUPPRESS EVIDENCE SEIZED PURSUANT TO THE TWO SEARCH WARRANTS

Anchorage Police Officers searched the residence of Defendant Drew at 10270 Tartan Circle, Anchorage Alaska and later searched a 2001 Dodge Durango Vehicle being driven by Defendant Drew. The searches were conducted pursuant to search warrants. The search warrant applications were fraught with improprieties. Each defect, standing alone, requires suppression of the evidence obtained pursuant to the warrants. Mr. Drew therefore asks the Court to suppress the evidence seized pursuant to the search warrants under any of the theories articulated below,

Motion to Suppress Evidence
USA v. Drew et.al.
Page 1 of 8

and then to dismiss the indictment which was based on the introduction of this improperly

obtained evidence.

Defendant Gerald H. Drew and co-Defendant Juanita L. Harris were indicted by

the Grand Jury of the United District Court for the District of Alaska on or about July

20th, 2006.

The basis of that indictment was evidence obtained from execution of State of

Alaska search Warrant No. 3ANS-06-607 SW, issued on May 17th, 2006 (Exhibit A) The

basis for the Search Warrant was the Affidavit of Anchorage Police Officer G.K. Dorr.

The Search Warrant authorized the search of a home at 10270 Tartan Cr., Anchorage,

Alaska. Defendant Drew resided at 10270 Tartan Circle.

Defendant Drew contends that the Search Warrant issued in 3ANS-06-607 SW

was not based on probable cause, and therefore the fruits of the search must be

suppressed. This suppression would also give rise to the non-use of the evidence at the

Grand Jury. Further, after the Indictment was filed and an arrest warrant issued, a United

States Magistrate Judge issued Search Warrant 3:06-MJ-00159 authorizing the search of

the 2001 Dodge Durango. The Affidavit used to show probable cause for a search in

3:06-MJ-00159 was based upon the indictment, improperly found because of the use of

suppressible evidence from the search authorized by 3ANS-06-0607 SW.

For the reasons set forth below, the court must suppress the evidence obtained in

the search of 10270 Tartan Circle arising under Search Warrant 3ANS-06-607, and

subsequently must dismiss the indictment as having been based upon improperly seized

evidence, and further must also suppress the evidence obtained by virtue of the warrant

issued in 3:06-MJ-00159 from the 2001 Dodge Durango.  Reasons for these dismissals

are set forth below.

## STATEMENT OF THE CASE

Anchorage Police Department officers searched a home 10270 Tartan Circle in

Anchorage, Alaska in violation of the 4th Amendment.  They turned over the fruits of that illegal

search to the agents of the federal government who used them as evidence in a Grand Jury

proceeding and obtained an indictment against the above-named Defendants.  Defendant Drew

was subsequently arrested as a result of the indictment. Based upon the previously illegally

obtained evidence, and the fact that Drew had been indicted, federal agents obtained a search

warrant from a U.S. District Court Magistrate Judge to search a 2001 Dodge Durango believed

being driven by Defendant Drew wherein they found additional evidence.

Defendant is asking this court to suppress evidence found in both searches since the

Search Warrant on which the officers relied to search the Dodge Durango was itself the fruit of

an illegal search of the residence at 10270 Tartan Circle.

1.      This case starts in the Anchorage Police Department when APD officer G.K. Dorr

on May 1st, 2006 filed an Affidavit in support of a search warrant and obtained a Warrant for a

wire to record and/or film drug dealing transactions of J. Harris over a 15-day period. (See EX. A

3ANS-06-530 SW)

On May 16th, 2006, APD officer Dorr obtained another warrant, 3ANS-06-603 SW (Ex.

B) again requesting and receiving an additional 15 days to wire/record and/or film transactions

with J. Harris.

Subsequently on May 17th, 2006 APD officer G.K. Dorr obtained Search Warrant 3ANS-06-607 SW (Ex. C). The requested area to be searched with this search warrant was the residence at 10270 Tartan Circle in Anchorage, Alaska. and Exhibit D: 3:06-MJ-00159 obtained on July 31st, 2006.

In officer Dorr's Affidavit in Support of Issuance of 3ANS-06-607 SDW (Ex. C) in the background section thereof, he sets forth the following,

> "...this case involves cocaine distribution by Juanita Michelle Harris (J. Harris) a.k.a. "Shell" a.k.a. "Cruz" a.k.a. "Cousin." Between 5-3-06 and 5-16-06, APD DEU made three controlled cocaine buys from J. Harris using a cooperating source (CS) and recorded money. Observations during the investigations indicate that J. Harris is staying at the residence at 10270 Tartan Circle. I am seeking a Search Warrant for 10270 Tartan Circle, as well as J. Harris' vehicle, a 1999 Chevy Tahoe, EJT-630."

Subsequently, in the section under "facts and observations" APD Officer Dorr states that on 5-3-06 APD set up a buy of cocaine J. Harris. Later in that evening, Officer Dorr indicates, (Par. #9), but does not explain, that for some reason he "drove into the area of 10270 Tartan Circle", and says he saw a white Chrysler EYF-669, parked in the driveway, and a Tahoe, EJT-630, and one other vehicle in the area at 10270 Tartan Circle.

Officer Dorr indicated he had earlier seen J. Harris talk to a male who was in the white Chrysler EYF-669 prior to the sale of cocaine. At 1:10 A.M. on 5-17-06, Officer Dorr, again being in the area of 10270 Tartan Circle, sees Harris' Tahoe, EJT-630 parked in the driveway. Later at 7:31 A.M. Dorr again sees the Tahoe parked in that area.

At no time during this period from 5-3-06 through 5-17-06 has any sale of cocaine been arranged where J. Harris' Tahoe has been seen leaving 10270 Tartan Circle, nor at any time after the immediate sale was she ever observed to have gone directly back to 10270 Tartan Circle. In

fact, Officer Dorr fails to disclose anything other than the silver Tahoe, was sometimes seen at the 10270 Tartan Circle address.

No documentation concerning electric bills, rent receipts, ownership of the property or any other evidence suggests that 10270 Tartan Circle was the residence of J. Harris.

Further, in each of the buys in which APD supposedly used marked money or bills they copied before and could have identified afterwards, there was no showing that these monies or bills were taken to 10270 Tartan Circle after any of the sales referred to in Dorr's affidavit.

In fact, the only thing that can be concluded by APD Officer Dorr's Affidavit is that Harris' Tahoe spent a lot of time at 10270 Tartan Circle. This is not the type of probable cause that supports the issuance of a search warrant under the 4th Amendment of the United States Constitution.

The Fourth Amendment requires that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation. (*U.S. Const. Amend. IV.*) Evidence obtained pursuant to a search warrant, that is later found to be invalid for lack of probable cause, is admissible if the executing officers acted in good faith and in objectively reasonable reliance on the warrant. See *United States v. Leon*, 468 U.S. 897 (1984). However, "an officer cannot manifest objective good faith if the warrant he is relying upon was supported by an affidavit that is 'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable.'" *United States v. Hove*, 848 F.2d 137, 139 (9th Cir. 1988) (quoting *Leon*, 468 U.S. at 923). In Hove, the defendant was suspected of mailing threatening communications. Officers executed a search warrant at a residence where it was believed the defendant was residing. The Ninth Circuit held the warrant was so lacking in probable cause that the evidence seized should have

Motion to Suppress Evidence
USA v. Drew et.al.
Page 5 of 8

been suppressed, reasoning that the supporting affidavit did "not offer an explanation of why the police believed that they may find incriminating evidence at [the location of the search] . . . .    It is critical to a showing of probable cause that the affidavit state facts sufficient to justify a conclusion that evidence or contraband will probably be found at the premises searched." *Hove*, 848 F.2d at 140. At best, the affidavit establishes probable cause that Ms. Harris committed the crime of selling cocaine. The affidavit, however, does not make any showing that probable cause existed to believe that evidence would be found at the premises searched.

First, the affidavit does not sufficiently link Defendant Harris to the Tartan Circle residence. It merely states that she was seen more than once at the residence. Certainly, the facts in the affidavit did not establish probable cause to believe that Defendant Harris lived at the residence. There was a total lack of evidence such as utility bills, rent receipt, or ownership of the property to form a belief as Harris' reasons for being at the residence. The mere fact that Ms. Harris had been seen at the Tartan Circle residence does not mean there is probable cause to believe that evidence of criminal activity would be found there.

Similarly, the affidavit clearly did not establish probable cause to believe that evidence would be found at the Tartan Street residence at the time of the search. Moreover, even assuming the affidavit established probable cause to believe that Ms. Harris was selling cocaine, it contained no facts to indicate that she was doing so out of 10270 Tartan Circle. In fact, the affidavit reveals that the only time Ms. Harris was seen at the residence was on the evening of May 3, 2006 when she was leaving the location at 11:35 P.M. (Par. #9) and at 7:34 A.M. when she was seen pulling into the driveway of the residence. (Par #20). The other impression of her being at 10270 Tartan Circle was because the Silver Tahoe, EJT-630 was seen at 1-270 Tartan Circle on:

Motion to Suppress Evidence
USA v. Drew et.al.
Page 6 of 8

May 6, 2006 at 7:56 PM
May 9, 2006 at 11:50 AM
May 13, 2006 at 11:30 PM
May 17, 2006 at 1:10 AM

Finally, the affidavit merely states that the Silver Tahoe, EJT-630 is Ms. Harris car. (Par #7) There is no showing that she owns the car, but only used it on the indicated dates. The use of this vehicle by Ms. Harris in no way provides probable cause to believe that evidence would be found inside the residence at 10270 Tartan Circle at the time of the search. Indeed, the warrant, on its face foolishly permits a search of the car identical to the search of the residence, including a search for computers.

In sum, the warrant lacks any particularity as to the location of suspected evidence. The warrant also lacks any temporal specificity. As a result, under the principles of *Hove,* Supra, this Court should suppress the evidence seized due to its unreasonably deficient showings of probable cause. See also *Segura v. United States*, 468 U.S. 796, 804 (1984); *Georgia v. Randolph*, 126 S. Ct. 1515, 1523 (2006);

### THE COURT SHOULD SUPPRESS THE EVIDENCE
### OBTAINED FROM THE SECOND SEARCH WARRANT
### (3:06-mj-00159)

On July 20, 2006, Gerald Drew was indicted by a Federal Grand Jury in Anchorage Alaska for multiple drug trafficking and related crimes. The Grand Jurors were most assuredly presented with the illegally obtained evidence from the search of the residence at 10270 Tartan Circle.

An arrest warrant was issued for Gerald Drew and on July 27, 2006 he was arrested. After his arrest, a set of vehicle keys to a Silver 2001 Dodge Durango was found on him. Officer Mikell Van Dolteren sought a search warrant (Ex. D) alleging the fact that Drew had been indicted and setting out statements Drew made after his arrest.

Motion to Suppress Evidence
USA v. Drew et.al.
Page 7 of 8

Since the indictment was based on illegally obtained evidence the subsequent arrest and statements made by Drew are "fruits of the poisonous tree." *Wong Sun V. United States*, 371 U.S. 471 (1963).

## CONCLUSION

The search of the residence at 10270 Tartan Circle was not supported by probable cause and the evidence obtained in that such must be suppressed. Since the illegally obtained evidence was most assuredly presented to the grand jury and formed the basis of the indictment against him, it to must be dismissed, and any subsequently obtained evidence must be suppressed as being obtained as fruit of the poisonous tree.

Dated at Anchorage, Alaska this 18th day of September 2006.

AGLIETTI OFFRET & WOOFTER
Attorneys for Gerald Drew

Ronald A. Offret #7410096
733 West 4th Ave., Suite 206
Anchorage, Alaska 99501
(907) 279-8657

APD 06-19905

## IN THE TRIAL COURT FOR THE STATE OF ALASKA
## THIRD JUDICIAL DISTRICT AT ANCHORAGE

AFFIDAVIT IN SUPPORT OF )
APPLICATION FOR SEARCH )
WARRANT )

FILED in the Trial Courts
State of Alaska, Third District

MAY 1 2006

3ANS-06-530 SW

Clerk of Trial Courts

### AFFIDAVIT OF G.K. DORR    By————————Deputy

I, G.K. Dorr, being first duly sworn on oath, hereby depose and state:

1.  I am a police officer employed by the Anchorage Police Department (APD) and am currently assigned as a detective in the Drug Enforcement Unit. My assignment with APD's Drug Enforcement Unit entails investigation of cases involving controlled substances.

2.  I have more than nine years of combined law enforcement experience. I was employed as a police officer by the Metropolitan Police Department, Washington, D.C., (MPD) from June of 1987 until December of 1988. I have been employed as a police officer by APD since December of 1997.

3.  I attended and graduated from a six-month police academy operated by MPD. While attending MPD's academy, I received training and instruction on devices, paraphernalia, techniques, and practices used by people engaged in the use, possession, and trafficking of controlled substances. In an extension of MPD's training, and subsequent to graduation from MPD's academy, I received several months of additional training and instruction under the tutelage and supervision of a senior patrol officer before being certified. This additional training also included the investigation of crimes involving the use, possession, and trafficking of controlled substances in the Washington, D.C. area.

4.  I attended and graduated from a five-month police academy operated by APD. While attending APD's academy, I received training and instruction on devices, paraphernalia, techniques, and practices used by people engaged in the use, possession, manufacture, and trafficking of controlled substances. In an extension of APD's training, and subsequent to graduation from APD's academy, I received three additional months of training and instruction from several APD Field Training Officers. This field training included investigation of crimes involving the use, possession, manufacture, and trafficking of controlled substances in the Anchorage area.

5.  In March of 2002, I attended the DEA's five-day Clandestine Laboratory Investigation/Certification Program. During this course, I learned how to

B=C . ORIG.

Affidavit of G.K. Dorr

Page 1 of 6

EXHIBIT " A "
Page 1 of Pages

000019

APD 06-19905

identify, classify, investigate and dismantle clandestine laboratories in accordance with applicable OSHA and EPA regulations. Under the supervision of DEA chemists, I participated in the manufacture of methamphetamine using two different methods. In June of 2002, I attended the DEA's 80 hour Basic Drug Investigations course. In this course, I learned, among other things, about the devices, paraphernalia, techniques, materials, and practices used by people engaged in the use, possession, manufacture, and trafficking of controlled substances, including cocaine, heroin, methamphetamine, and marijuana, among others.

6.  During my tenure as a police officer, I have conducted and/or participated in numerous investigations relating to the use, possession, manufacture, and trafficking of controlled substances, and I have become familiar with devices, paraphernalia, techniques, and practices used by people engaged in the use, possession, manufacture, and trafficking of controlled substances. I have conducted and/or participated in investigations which have resulted in the seizure of marijuana, marijuana grow operations, cocaine hydrochloride, cocaine base (crack), opium, PCP, heroin, ecstasy (MDMA), methamphetamine, methamphetamine laboratories, prescription medications, firearms, pagers, cellular telephones, surveillance systems, computers, documents, money, and precious metals. I have also conducted numerous interviews of people involved in the use, possession, manufacture, and trafficking of controlled substances, adding to my knowledge of the illegal drug culture in the Anchorage area. In addition to my formal training and experience, I have gained knowledge and insight by working and speaking with many experienced law enforcement agents from local, state, and federal agencies, and I consider this knowledge and insight to be an integral part of my experience and training.

7.  I received a bachelor's degree from the University of Maryland's Institute of Criminal Justice and Criminology in May of 1987. I received a Juris Doctor from Mercer University's Walter F. George School of Law in May of 1992.

8.  Based on my training and experience, I know that people involved in the use, possession, manufacture, and/or trafficking of controlled substances commonly possess and use cellular telephones, telephones, computers, and pagers to facilitate these activities. Regarding cellular telephones in particular, I know that drug traffickers will use cellular telephones to facilitate their activities because of the mobility offered by cellular telephones. Further, drug traffickers are attracted to cellular telephones because they enable suspects to avoid the risks attendant with operating from a fixed location. Additionally, cellular telephones afford spontaneous access to drug customers and to drug sources.

B=C. ORIG.

Affidavit of G.K. Dorr

EXHIBIT " A " Page 2 of 6

Page 2 of ____ Pages

APD 06-19905

9. Based on my training and experience, I know that people involved in the use, possession, manufacture, and/or trafficking of controlled substances commonly engage in these activities at all hours of the day and night.

10. Based on my training and experience, I know that people involved in the distribution of controlled substances commonly use veiled language and/or code words when talking about controlled substances. Some examples include the words "Zip" and "OZ" to mean an ounce. Other examples are the words "Seven" and "Seven Up" and "Fat Seven" all referring to a quarter ounce, which weighs approx seven grams. An eighth of an ounce is commonly referred to as an "Eight ball," a "Ball," or "Playing Pool." A sixteenth of an ounce is commonly referred to as a "Teener." The terms "Ready," "Crispy," "Done Up," and "Hard" refer to cocaine base, as opposed to cocaine hydrochloride, which is commonly referred to as "Soft."

## BACKGROUND

This case involves the suspected cocaine distribution activities of Juanita Michelle Harris (J. Harris), a/k/a "Shell" a/k/a "Cuz" a/k/a "Cousin." On 3/14/06, APD Drug Enforcement Unit conducted a controlled cocaine buy from Liza Rene Harris (L. Harris) wherein J. Harris arrived and appeared to deliver to L. Harris, who in turn delivered approx 11.8 grams of cocaine base to a Cooperating Source (CS). CS advises CS can buy cocaine directly from J. Harris. I anticipate conducting controlled cocaine buys from J. Harris, and am seeking a Glass warrant for that purpose.

## FACTS AND OBSERVATIONS:

1. In early November of 2005, APD Ofc. R. Rhodes conducted an investigation involving CS. As a result of Rhodes' investigation, CS is subject to prosecution for possession of a crack stem as well as distribution of cocaine, for which CS has not yet been charged. After confronting CS with the results of his investigation, Rhodes recruited CS as a cooperator. CS is a long term cocaine user and is cooperating with law enforcement in an effort to gain consideration for CS' crimes. APSIN shows CS has a 1997 conviction for robbery 1st, a 1995 misdemeanor conviction for damage to property, and two counts of shoplifting from 1994.

2. CS has assisted me in several cocaine investigations. As a result of CS' cooperation, I have obtained evidence which I anticipate will support cocaine distribution charges against five people. I have found CS to be reliable.

3. At some point in mid January, I was out of state, and instructed CS to communicate with Det. M. Doll during my absence. During this period, CS

Sec. Org.

Affidavit of G.K. Dorr

EXHIBIT "A"

Page 3 of 6

Page 3 of Pages

APD 06-19905

told Doll that a crack dealer known to CS as "Big Lisa" had offered CS eight ounces of crack at $800 per ounce. When I returned, I spoke with CS, who described Big Lisa as a heavy set black female who had a hair salon. CS told that me that Big Lisa's cell number was 744-6739.

4.   On 3/14/06, I showed CS a Lineup including the OL image of Liza Rene Harris. CS identified the image of Liza Rene Harris as the Lisa Harris a/k/a "Big Lisa" CS had previously spoken of.

5.   I discussed the case with DEA T/F/O A. Kennedy. Kennedy advised that in light of his preexisting federal cocaine investigation regarding L. Harris, I should proceed with consensual recording. At my direction, and while I recorded, CS called for L. Harris at Harris' cell, 744-6739. Doll and I then heard CS' half of a brief conversation wherein CS ordered a "half" and asked the price. After the call, CS told us that CS had reached L. Harris and that L. Harris was agreeable, telling CS to call back for the price in 15 minutes. I planned and briefed a wired controlled cocaine buy using CS and recorded money. Those participating were DEA S/A M. Schmidt, DEA T/F/O's A. Kennedy and J. Gregg; APD Det.'s Lt. C. Stevens, B. Balega, M. Doll, K. Kornchuk; CDSP personnel, and me. As planned, Stevens was to drive CS in a DEU vehicle to and from the deal. I searched the DEU vehicle and found it clear of contraband. Doll strip searched CS and fitted CS with a transmitter. CS was provided with a set of digital scales and $650 in recorded DEU money. Team members set up in the initial meet location. I followed Stevens as she drove CS to the initial meet location, arriving at approx 1646. Stevens then joined me in my vehicle, leaving CS in the DEU vehicle.

6.   At approx 1649, I directed CS to call for L. Harris. CS left recorded messages requesting return calls. At approx 1714, CS received an incoming call from L. Harris' cell. After the call, CS told us that L. Harris had proposed to send her cousin, "Michelle" but that CS told L. Harris that CS did not want to deal with the cousin. CS further advised that it would be 30 minutes until L. Harris could arrive.

7.   At approx 1740, CS advised of an incoming text message from L. Harris asking if CS could meet her in twenty minutes at the Muldoon VFW hall. Team members set up in the area of VFW located at 101 Oklahoma. Stevens and I followed CS as CS drove the DEU vehicle into the VFW lot, parking at approx 1757. At approx 1815, CS called L. Harris for an E/T/A.

8.   At approx 1853, CS received an incoming call from L. Harris advising that she would arrive in 30 seconds. At approx 1854, Schmidt reported seeing L. Harris' green Yukon traveling East on Boundary, towards the VFW. We then see L. Harris' green Yukon arrive and park in the lot. A metallic Tahoe, EJT-630 then arrived in the lot. APSIN shows EJT-630 is registered to Juanita Michelle Harris. I continued to monitor and record

Rec. Org.

Affidavit of G.K. Dorr

EXHIBIT "__A__"
Page __4__ of __ Pages

Page 4 of 6

000022

as CS made brief contact with L. Harris in L. Harris' green Yukon. The content of the conversation between CS and L. Harris is disclosed to the Court in an abundance of caution, and is not to be considered in the determination of the presence or absence of probable cause. We hear CS and L. Harris as they discuss the amount as $650, and Harris' need to take CS' money to her source in another truck in the lot. CS gets out of L. Harris' green Yukon and gets back into the DEU vehicle, advising that L. Harris needed to make contact with a truck in the lot. After making contact with the metallic Tahoe, L. Harris drives back to CS' location. We continue to monitor and record as the two discuss the identity of the metallic Tahoe driver as "Michelle," her haircut, and CS' reluctance to deal with her. L. Harris describes the weight as being "...a little over...", as well as L. Harris' need to reduce the weight by a twenty for a third party. L. Harris attributes her delay to the fact that an alternate source had wanted $700 for the cocaine.

9.    After the deal, Stevens and I followed CS as CS drove the DEU vehicle from the VFW lot to a designated location, where Stevens joined CS in the DEU vehicle. I followed as Stevens drove CS back to DEA in the DEU vehicle. At DEA, Stevens handed me our digital scales and a quantity of suspected cocaine base in knotted plastic. I searched the DEU vehicle and found no contraband. Doll strip searched CS and found no contraband. With a recorder running, Doll and I debriefed CS, who described buying approx 13.4 grams of crack from L. Harris in a manner consistent with our observations and the wire traffic. CS added that L. Harris' cousin was "Michelle" or "Shell'" and that CS knows her. I took pictures of CS' telephone showing the text message from L. Harris. The suspected cocaine was later analyzed by the Alaska Scientific Crime Detection Laboratory and found to be cocaine base.

10.   During the morning of 3/15/06, I showed Schmidt the OL image of Juanita Michelle Harris. Schmidt identified Juanita Michelle Harris as the driver of the metallic Tahoe, EJT-630. Schmidt further told me that he watched J. Harris after she left the VFW lot in the metallic Tahoe, driving West on Boundary, across Turpin, and continuing to Boniface, where Schmidt broke off.

11.   On 3/17/06, I spoke with CS by telephone and asked for J. Harris' cell number. Later that afternoon, CS called and told me that CS had called L. Harris and asked for Michelle's number. CS advised L. Harris provided 744-7209 as Michelle's number.

12.   On 4/6/06, I showed CS a Lineup including the OL image of Juanita Michelle Harris. CS identified the image of Juanita Michelle Harris as "Cuz."

Bec. Oach.

APD 06-19905

13.    I anticipate conducting controlled buys of cocaine from J. Harris with the assistance of CS. In light of the above facts, I submit there is probable cause to believe that J. Harris will discuss past, present, and/or future drug transactions with CS and/or any law enforcement officer introduced to J. Harris by CS. As such, I respectfully request the Court to grant APD a search warrant, based on the information contained in this affidavit, authorizing the electronic monitoring, recording, and/or filming of all conversations between CS and J. Harris, and/or J. Harris and any law enforcement officer introduced to J. Harris by CS, both over telephones, as well as face to face for the next fifteen days.

14.    It is expected that these conversations will contain evidence of the crime of misconduct involving controlled substances, and of past, present, and future illegal drug transactions.

15.    It has been my experience in dealing with people involved in the trafficking of controlled substances that these transactions occur over a period of time and that the investigation often exceeds the normal ten day limit given in the execution of a warrant to monitor, record, and/or film conversations. I ask that the Court to authorize the seizing and recording of both the telephone and face to face conversations for the next fifteen days. I also ask that the Court grant the authority to monitor and record these conversations at any time of the day or night.

16.    Further, I ask that the requirements of Alaska Criminal Rule 37 be relaxed pursuant to the provisions of Alaska Rule of Criminal Procedure 53 to dispense with the requirements of leaving a copy of this authorization and/or affidavit with the persons involved. Should they or others associated with them become aware of this authorization and/or the ongoing investigation, I believe that the investigation would be prematurely terminated. Additionally, the safety of CS and associated officers would be compromised.

17.    Further, I ask that this authorization be sealed by the Court in order to prevent unauthorized people from seeing this affidavit and authorization.

G.K. Dorr, Detective, APD

Subscribed and sworn to or affirmed before me
on this ⁊ / day of May, 2006.

Judge or Magistrate

Dec. Orig.

Affidavit of G.K. Dorr

EXHIBIT "A"    Page 6 of 6
Page 6 of ____ Pages

000024

APD 06-19905

# IN THE TRIAL COURT FOR THE STATE OF ALASKA
## THIRD JUDICIAL DISTRICT AT ANCHORAGE

FILED in the Trial Courts
State of Alaska Third District

AFFIDAVIT IN SUPPORT OF )
APPLICATION FOR SEARCH )
WARRANT )

MAY 1 2006

Clerk of the Trial Courts

By _____ Deputy

3ANS-06-603 SW

## AFFIDAVIT OF G.K. DORR

I, G.K. Dorr, being first duly sworn on oath, hereby depose and state:

1.    I am a police officer employed by the Anchorage Police Department (APD) and am currently assigned as a detective in the Drug Enforcement Unit. My assignment with APD's Drug Enforcement Unit entails investigation of cases involving controlled substances.

2.    I have more than nine years of combined law enforcement experience. I was employed as a police officer by the Metropolitan Police Department, Washington, D.C., (MPD) from June of 1987 until December of 1988. I have been employed as a police officer by APD since December of 1997.

3.    I attended and graduated from a six-month police academy operated by MPD. While attending MPD's academy, I received training and instruction on devices, paraphernalia, techniques, and practices used by people engaged in the use, possession, and trafficking of controlled substances. In an extension of MPD's training, and subsequent to graduation from MPD's academy, I received several months of additional training and instruction under the tutelage and supervision of a senior patrol officer before being certified. This additional training also included the investigation of crimes involving the use, possession, and trafficking of controlled substances in the Washington, D.C. area.

4.    I attended and graduated from a five-month police academy operated by APD. While attending APD's academy, I received training and instruction on devices, paraphernalia, techniques, and practices used by people engaged in the use, possession, manufacture, and trafficking of controlled substances. In an extension of APD's training, and subsequent to graduation from APD's academy, I received three additional months of training and instruction from several APD Field Training Officers. This field training included investigation of crimes involving the use, possession, manufacture, and trafficking of controlled substances in the Anchorage area.

5.    In March of 2002, I attended the DEA's five-day Clandestine Laboratory Investigation/Certification Program. During this course, I learned how to

ORIG. RENEW

Affidavit of G.K. Dorr

Page 1 of 8

EXHIBIT "B"

Page 1 of ___ Pages

000037

identify, classify, investigate and dismantle clandestine laboratories in accordance with applicable OSHA and EPA regulations. Under the supervision of DEA chemists, I participated in the manufacture of methamphetamine using two different methods. In June of 2002, I attended the DEA's 80 hour Basic Drug Investigations course. In this course, I learned, among other things, about the devices, paraphernalia, techniques, materials, and practices used by people engaged in the use, possession, manufacture, and trafficking of controlled substances, including cocaine, heroin, methamphetamine, and marijuana, among others.

6.    During my tenure as a police officer, I have conducted and/or participated in numerous investigations relating to the use, possession, manufacture, and trafficking of controlled substances, and I have become familiar with devices, paraphernalia, techniques, and practices used by people engaged in the use, possession, manufacture, and trafficking of controlled substances. I have conducted and/or participated in investigations which have resulted in the seizure of marijuana, marijuana grow operations, cocaine hydrochloride, cocaine base (crack), opium, PCP, heroin, ecstasy (MDMA), methamphetamine, methamphetamine laboratories, prescription medications, firearms, pagers, cellular telephones, surveillance systems, computers, documents, money, and precious metals. I have also conducted numerous interviews of people involved in the use, possession, manufacture, and trafficking of controlled substances, adding to my knowledge of the illegal drug culture in the Anchorage area. In addition to my formal training and experience, I have gained knowledge and insight by working and speaking with many experienced law enforcement agents from local, state, and federal agencies, and I consider this knowledge and insight to be an integral part of my experience and training.

7.    I received a bachelor's degree from the University of Maryland's Institute of Criminal Justice and Criminology in May of 1987. I received a Juris Doctor from Mercer University's Walter F. George School of Law in May of 1992.

8.    Based on my training and experience, I know that people involved in the use, possession, manufacture, and/or trafficking of controlled substances commonly possess and use cellular telephones, telephones, computers, and pagers to facilitate these activities. Regarding cellular telephones in particular, I know that drug traffickers will use cellular telephones to facilitate their activities because of the mobility offered by cellular telephones. Further, drug traffickers are attracted to cellular telephones because they enable suspects to avoid the risks attendant with operating from a fixed location. Additionally, cellular telephones afford spontaneous access to drug customers and to drug sources.

APD 06-19905

9. Based on my training and experience, I know that people involved in the use, possession, manufacture, and/or trafficking of controlled substances commonly engage in these activities at all hours of the day and night.

10. Based on my training and experience, I know that people involved in the distribution of controlled substances commonly use veiled language and/or code words when talking about controlled substances. Some examples include the words "Zip" and "OZ" to mean an ounce. Other examples are the words "Seven" and "Seven Up" and "Fat Seven" all referring to a quarter ounce, which weighs approx seven grams. An eighth of an ounce is commonly referred to as an "Eight ball," a "Ball," or "Playing Pool." A sixteenth of an ounce is commonly referred to as a "Teener." The terms "Ready," "Crispy," "Done Up," and "Hard" refer to cocaine base, as opposed to cocaine hydrochloride, which is commonly referred to as "Soft."

## BACKGROUND

This case involves the suspected cocaine distribution activities of Juanita Michelle Harris (J. Harris), a/k/a "Shell" a/k/a "Cuz" a/k/a "Cousin." On 5/1/06, I obtained Glass warrant 06-530 for use in this case. The supporting affidavit for 06-530 is attached as Exhibit "A." On 5/3/06 and on 5/11/06, APD Drug Enforcement Unit conducted controlled cocaine buys from J. Harris. My original Glass warrant has expired. I anticipate conducting additional controlled cocaine buys from J. Harris, and am seeking a new Glass warrant for that purpose. Relevant events occurring after the original Glass was issued appear below.

## FACTS AND OBSERVATIONS:

1. On 5/2/06, CS called and told me that J. Harris had called last night at midnight, and that the two had discussed the availability of cocaine for sale. CS told me that J. Harris advised that many of her customers were social security recipients and that she expected to have cocaine available for CS on 5/3/06, which would coincide with social security checks.

2. On 5/3/06, I planned and briefed a wired controlled half ounce cocaine buy from J. Harris, using CS and recorded money. As planned, Det. Doll was to drive CS to and from the meet location in a DEU vehicle, and remaining team members were to follow J. Harris from the deal. Doll strip searched CS and found no contraband. Doll fitted CS with a wire. Doll searched the DEU vehicle and found it clear. Doll provided CS with $650 in recorded money as well as a set of digital scales. Team members then set up in the area of the meet. We departed DEA at approx 1734, with me following Doll and CS in the DEU vehicle. We arrived at the meet location and parked at approx 1746.

APD 06-19905

3.  At approx 1755, CS called for J. Harris at 744-7209, leaving a recorded message requesting a return call. At approx 1805, CS received an incoming call from J. Harris. CS ordered a half ounce, hard. The two discussed the price as $650, and CS advised of her location for the meet. J. Harris advised she would arrive within 8 minutes. At approx 1813, CS received an incoming call from J. Harris, confirming CS' location.

4.  At approx 1822, J. Harris arrived in the lot driving her Tahoe, EJT-630. J. Harris called CS and parked. CS walked from the DEU vehicle and joined J. Harris and a small child in J. Harris' Tahoe. We monitored and recorded as the two discussed the deal, with CS instructing J. Harris to count the money. When J. Harris produced the cocaine, we heard CS decline it, as it was in powder form, and CS had specified hard. J. Harris offered to run to Dowling to get hard, and would return in 15 minutes, with CS agreeing to wait. CS then got out of J. Harris' Tahoe and returned to the DEU vehicle to wait for J. Harris' return. Doll and I remained in the lot watching CS while remaining team members followed J. Harris from the lot. J. Harris again called CS and confirmed CS was willing to wait. Team members reported that they followed J. Harris to a residential address for a brief visit, and then to a restaurant, where she appeared to buy food. J. Harris left the restaurant and drove to the Fred Meyer at 2300 Abbott Road where she made contact with the male driver of a white Chrysler, EYF-669. The driver of the Chrysler was later identified. APSIN shows EYF-669 is registered to Rental Car Finance Corp. Team members reported following J. Harris as she drove back to the meet location, arriving at approx 1924 and parking to the South of CS in the DEU vehicle. We watch as CS gets out of the DEU vehicle and joins J. Harris in the Tahoe. We monitor and record during the deal, to include CS again instructing J. Harris to count the money, and asking J. Harris if her money is straight, as well as conversation with the child. Additionally, J. Harris gave CS food from the restaurant. With the deal apparently complete, CS gets out of J. Harris' Tahoe and returns to the DEU vehicle. Doll then joined CS in the DEU vehicle, and drove back to DEU, with me following.

5.  Back at DEA, Doll and CS got out of the DEU vehicle and told me that the scales and suspected crack cocaine were in the center console. I recovered the scales and a quantity of suspected cocaine base in knotted plastic from the vehicle. I then searched the vehicle and found no contraband other than the previously mentioned suspected cocaine. Doll again strip searched CS and found no contraband. Using an ODV, Inc. #904B cocaine salts and base reagent test kit, I field tested the suspected cocaine base and obtained positive results for the probable presence of cocaine. I then packaged the suspected cocaine for submission to APD Property & Evidence section. With a recorder running Doll and I debriefed CS, who described buying the suspected cocaine from J. Harris in a manner consistent with our observations and the wire traffic. CS also reported that the child was present in J. Harris' Tahoe both during the first meet, as well

/ EXHIBIT " _B_ "   Page 4 of 8

Page _4_ of ____ Pages

APD 06-19905

as when J. Harris returned. The suspected cocaine base was later analyzed by the Alaska Scientific Crime Detection Laboratory and determined to be 12.8 grams of cocaine base.

6.     That night, at approx 2335, I drove into the area of 10270 Tartan Circle. The white Chrysler, EYF-669 was parked in the driveway. J. Harris' Tahoe, EJT-630 and a gray Hyundai, DXF-708 were parked at the curb in front of the residence. APSIN shows DXF-708 is registered to two subjects at 10270 Tartan Circle, one of whom is the male identified as driving the white Chrysler. As I pulled out of the cul de sac, a subject wearing a white shirt emerged from the area of the door and walked towards the Chrysler. I departed and drove to Carr's at 1725 Abbott Road to buy groceries. While in the checkout line, I saw J. Harris enter the store wearing a white shirt and realized she was the person I had seen emerge from the area of the door at 10270 Tartan. I went out into the lot and saw the white Chrysler, EYF-669 parked unoccupied. J. Harris eventually emerged from the store carrying a grocery bag. I watched J. Harris get into the Chrysler and drive to another parking space in the lot. J. Harris parked and turned off her lights. I then departed.

7.     During the morning of 5/6/06, CS called and told me that during the previous night, CS had been in the area of Boundary and Muldoon and was approached by J. Harris in the Tahoe. In veiled terms, J. Harris inquired as to whether CS needed any cocaine, indicating that she presently had her supply with her. CS declined. This contact was not recorded.

8.     On 5/6/06, at approx 1956, I drove into the area of 10270 Tartan Circle. The white Chrysler, EYF-669 was parked in the driveway, J. Harris' Tahoe, EJT-630 and a silver Dodge Durango, ETN-847 were parked at the curb.

9.     On 5/9/06, at approx 1150, I went into the area of 10270 Tartan Circle. J. Harris' Tahoe was present, as was the silver Dodge Durango and the Hyundai. That evening, I had contact with CS at DEA. I planned a controlled cocaine buy from J. Harris. Preparations were made, and at approx 1835, and while in the presence of Doll, CS called for J. Harris at 744-7209 and ordered a half ounce, hard. J. Harris told CS that she was on the phone long distance and asked CS to call back in twenty minutes to arrange a meeting place. At approx 1842, CS received an incoming call from J. Harris, wherein CS and J. Harris set the meeting place as Fred Meyer on Abbott Road. At approx 1917, CS and J. Harris again spoke by telephone, with J. Harris advising an ETA of an hour. At approx 1930, at my direction, CS called J. Harris and advised that CS would go elsewheres for the deal and would be calling again next week. J. Harris agreed.

10.     On 5/11/06, at approx 0735, I went into the area of 10270 Tartan Circle. The silver Durango was parked in the driveway. The Hyundai and a blue motorcycle, 1295RG were parked at the curb in front of the residence.

Affidavit of G.K. Dorr

Page 5 of 8

EXHIBIT " _B_ "

Page _5_ of _____ Pages

000041

APD 06-19905

That evening, I planned and briefed a controlled cocaine buy using CS and recorded money. While Doll and I recorded, CS called for J. Harris at 744-7209. The first several calls went to J. Harris' voice mail, and CS inadvertently called another number. CS then reached J. Harris. In veiled terms, CS ordered cocaine and the two agreed to meet at Popeye's on Boniface, with a 20 minute ETA.

11. I searched the DEU vehicle which CS was to drive to and from the deal and confirmed it was free of contraband. Doll strip searched CS and found CS clear of contraband. Doll equipped CS with a wire. We provided CS with $650 in recorded money and a set of digital scales. Team members set up in the area of the Popeye's on Boniface. Doll and I followed CS as CS drove the DEU vehicle to Popeye's, parking at approx 1832. At approx 1837, I instructed CS to call J. Harris. After a series of telephone contacts between CS and J. Harris, the two agreed to change the meet location to the Sear's Mall. At approx 1937, we moved from the Popeye's lot, with Doll and I following CS as CS drove the DEU vehicle to the Sear's lot, parking at approx 1950. CS then called for J. Harris, who advised she was on her way.

12. J. Harris arrived in the lot driving her silver Tahoe, EJT-630 at approx 2021. J. Harris was again accompanied by a small child. When J. Harris arrived, we watched CS get out of the DEU vehicle and join J. Harris and the child in J. Harris' Tahoe. We monitored the conversation during the deal, to include CS instructing J. Harris to count the money, and asking if she has weights (scales) as well as a discussion of the weight as 15.2 grams. The child is heard in the background. CS chides J. Harris for tonight's delay, and asks J. Harris if the count on the money was straight.

13. With the deal apparently complete, we watched CS return to the DEU vehicle. Team members followed J. Harris out of the lot and away. While following, Lt. Stevens observed J. Harris' face and confirmed her identity. Doll and I followed CS as CS drove from the lot to a location where I instructed CS to park. Doll then joined CS in the DEU vehicle. Doll recovered the suspected cocaine in a cigarette box from CS. Doll searched CS and the DEU vehicle and found no contraband other than the previously mentioned suspected cocaine. Doll debriefed CS, who described purchasing the suspected cocaine from J. Harris in a manner consistent with our observations as well as the wire traffic. CS added that the child from the earlier buy was again present in J. Harris' vehicle. CS estimated the child's age at 2 to 2 1/2 years and advised her name was similar to "Diara." CS also advised that J. Harris handed the cocaine to CS w/in a cigarette box and that the suspected cocaine had weighed approx 15.2 grams. Back at DEA, Doll turned the suspected cocaine over to me, inside a plastic bag further contained within a cigarette box. Using a Nartec, Inc. cocaine test ampule, I conducted a field test of the suspected cocaine and obtained positive results for the probable presence of cocaine.

APD 06-19905

We packaged the suspected cocaine for submission to APD Property & Evidence section.

14. During the evening of 5/13/06, CS called and told me that CS had received an incoming call from J. Harris' number that evening, but had not answered the call. That night, at approx 2330, I went into the area of 10270 Tartan Circle. J. Harris' silver Tahoe, EJT-630, and the silver Durango, ETN-847 were both in the driveway. I returned the following morning at approx 1043, and both the Tahoe and Durango were still present the drive way. The Hyundai was parked in the cul de sac, and there was a child's bike lying on the lawn.

15. On 5/15/06, at approx 0734, I went into the area of 10270 Tartan Circle. The silver Durango, ETN-847 was parked in the driveway, and the Hyundai was parked in the cul de sac, and the child's bike was still on the lawn. As I was leaving the area, J. Harris' silver Tahoe, EJT-630 arrived and pulled into the driveway behind the Durango.

16. On 5/15/06, at approx 2255, I went into the area of 10270 Tartan Circle. The silver Durango was parked in the driveway. J. Harris' silver Tahoe and the motorcycle were parked at the curb in front of the residence. The following morning, at approx 0703, I went back into the area. J. Harris' silver Tahoe, the motorcycle, and the Hyundai were all present, with J. Harris' Tahoe appearing to be in the same location as last night. The silver Durango was in the driveway. At approx 0800, I heard from CS, who advised J. Harris had called this morning and inquired as to whether CS needed anything, and indicated that she had cocaine for sale. This contact was not recorded.

17. I anticipate conducting controlled buys of cocaine from J. Harris with the assistance of CS. In light of the above facts, I submit there is probable cause to believe that J. Harris will discuss past, present, and/or future drug transactions with CS and/or any law enforcement officer introduced to J. Harris by CS. As such, I respectfully request the Court to grant APD a search warrant, based on the information contained in this affidavit, authorizing the electronic monitoring, recording, and/or filming of all conversations between CS and J. Harris, and/or J. Harris and any law enforcement officer introduced to J. Harris by CS, both over telephones, as well as face to face for the next fifteen days.

18. It is expected that these conversations will contain evidence of the crime of misconduct involving controlled substances, and of past, present, and future illegal drug transactions.

19. It has been my experience in dealing with people involved in the trafficking of controlled substances that these transactions occur over a period of time and that the investigation often exceeds the normal ten day

Affidavit of G.K. Dorr                                            Page 7 of 8

EXHIBIT " B "
Page 7 of ___ Pages                                    000043

APD 06-19905

limit given in the execution of a warrant to monitor, record, and/or film conversations. I ask the Court to authorize the seizing and recording of both the telephone and face to face conversations for the next fifteen days. I also ask that the Court grant the authority to monitor and record these conversations at any time of the day or night.

20. Further, I ask that the requirements of Alaska Criminal Rule 37 be relaxed pursuant to the provisions of Alaska Rule of Criminal Procedure 53 to dispense with the requirements of leaving a copy of this authorization and/or affidavit with the persons involved. Should they or others associated with them become aware of this authorization and/or the ongoing investigation, I believe that the investigation would be prematurely terminated. Additionally, the safety of CS and associated officers would be compromised.

21. Further, I ask that this authorization be sealed by the Court in order to prevent unauthorized people from seeing this affidavit and authorization.

G.K. Dorr, Detective, APD

Subscribed and sworn to or affirmed before me on this 16 day of May, 2006.

Judge or Magistrate

Affidavit of G.K. Dorr                                      Page 8 of 8

EXHIBIT " B "
Page 8 of ___ Pages

000044

APD 06-19905

IN THE TRIAL COURT FOR THE STATE OF ALASKA State of Alaska, Third District
THIRD JUDICIAL DISTRICT AT ANCHORAGE

AFFIDAVIT IN SUPPORT OF          )
APPLICATION FOR SEARCH           )
WARRANT                          )

MAY 7 2006

Clerk of Trial Courts
By _____
                 Deputy

3ANS-06- 607 SW

### AFFIDAVIT OF G.K. DORR

I, G.K. Dorr, being first duly sworn on oath, hereby depose and state:

1.  I am a police officer employed by the Anchorage Police Department
    (APD) and am currently assigned as a detective in the Drug Enforcement
    Unit. My assignment with APD's Drug Enforcement Unit entails
    investigation of cases involving controlled substances.

2.  I have more than nine years of combined law enforcement experience. I
    was employed as a police officer by the Metropolitan Police Department,
    Washington, D.C., (MPD) from June of 1987 until December of 1988. I
    have been employed as a police officer by APD since December of 1997.

3.  I attended and graduated from a six-month police academy operated by
    MPD. While attending MPD's academy, I received training and
    instruction on devices, paraphernalia, techniques, and practices used by
    people engaged in the use, possession, and trafficking of controlled
    substances. In an extension of MPD's training, and subsequent to
    graduation from MPD's academy, I received several months of additional
    training and instruction under the tutelage and supervision of a senior
    patrol officer before being certified. This additional training also included
    the investigation of crimes involving the use, possession, and trafficking
    of controlled substances in the Washington, D.C. area.

4.  I attended and graduated from a five-month police academy operated by
    APD. While attending APD's a cademy, I received training and
    instruction on devices, paraphernalia, techniques, and practices used by
    people engaged in the use, possession, manufacture, and trafficking of
    controlled substances. In an extension of APD's training, and s ubsequent
    to graduation from APD's a cademy, I received three additional months
    of training and instruction from several APD Field Training Officers. This
    field training included investigation of crimes involving the use,

Affidavit of G.K. Dorr

EXHIBIT " C  Page 1 of 11
Page  1  of _____ Pages

000025

APD 06-19905

possession, manufacture, and trafficking of controlled substances in the Anchorage area.

5.  In March of 2002, I attended the DEA's five-day Clandestine Laboratory Investigation/Certification Program. During this course, I learned how to identify, classify, investigate and dismantle clandestine laboratories in accordance with applicable OSHA and EPA regulations. Under the supervision of DEA chemists, I participated in the manufacture of methamphetamine using two different methods. In June of 2002, I attended the DEA's 80 hour Basic Drug Investigations course. In this course, I learned, among other things, about the devices, paraphernalia, techniques, materials, and practices used by people engaged in the use, possession, manufacture, and trafficking of controlled substances, including cocaine, heroin, methamphetamine, and marijuana, among others.

6.  During my tenure as a police officer, I have conducted and/or participated in numerous investigations relating to the use, possession, manufacture, and trafficking of controlled substances, and I have become familiar with devices, paraphernalia, techniques, and practices used by people engaged in the use, possession, manufacture, and trafficking of controlled substances. I have conducted and/or participated in investigations which have resulted in the seizure of marijuana, marijuana grow operations, powder cocaine, crack cocaine, opium, PCP, heroin, ecstasy (MDMA), methamphetamine, methamphetamine laboratories, prescription medications, firearms, pagers, cellular telephones, surveillance systems, computers, scales, packaging materials, documents, money, and precious metals. I have also conducted numerous interviews of people involved in the use, possession, manufacture, and trafficking of controlled substances, adding to my knowledge of the illegal drug culture in the Anchorage area. In addition to my formal training and experience, I have gained knowledge and insight by working and speaking with many experienced law enforcement agents from local, state, and federal agencies, and I consider this knowledge and insight to be an integral part of my experience and training.

7.  I received a bachelor's degree from the University of Maryland's Institute of Criminal Justice and Criminology in May of 1987. I received a Juris Doctor from Mercer University's Walter F. Geo rge School of Law in May of 1992.

8.  Based on my training and experience, I know that people involved in the use, possession, manufacture, and/or trafficking of controlled substances

APD 06-19905

commonly possess and use cellular telephones, telephones, computers, and pagers to facilitate these activities. Regarding cellular telephones in particular, I know that drug traffickers will use cellular telephones to facilitate their activities because of the mobility offered by cellular telephones. Further, drug traffickers are attracted to cellular telephones because they enable suspects to avoid the risks attendant with operating from a fixed location. Additionally, cellular telephones afford spontaneous access to drug customers and to drug sources.

9.      Based on my training and experience, I know that people involved in the use, possession, manufacture, and/or trafficking of controlled substances commonly engage in these activities at all hours of the day and night.

10.     Based on my training and experience, I know that people involved in the use, possession, manufacture, and/or trafficking of controlled substances commonly generate and retain documentary evidence of these activities, to include, but not limited to, receipts, writings memorializing illegal drug transactions, weights, money paid, wired, transferred, deposited, received, and owed, as well as customer/source lists, including names, addresses, and telephone numbers. Further, I know that these documents are often retained long after the transactions to which they refer have taken place, and that these documents are often retained in the residences of people involved in these activities, as well as in places where these activities take place.

11.     Based on my training and experience, I know that trafficking controlled substances is a cash business, and frequently very lucrative. Also based on my training and experience, I know that people involved in the possession, manufacture, and/or trafficking of controlled substances commonly possess money generated by these activities, and further that these people commonly possess stolen property accepted in exchanges for controlled substances. Further, based on my training and experience, I know that people involved in the possession, manufacture, and/or distribution of controlled substances commonly maintain and possess firearms to protect themselves, their controlled substances, and their trafficking proceeds. Further, I know that the above described documents, money, stolen property, and firearms are commonly found in the residences of drug traffickers, as well as in other places maintained for the trafficking of controlled substances, as well as lower profile locations sometimes referred to as "stas h houses."

12.     Based on my training and experience, I know that the items found on Attachment "A" are frequently found in places maintained for trafficking

APD 06-19905

activities, as well as the residences and vehicles of people engaged in the possession, manufacture, and/or trafficking of controlled substances, specifically cocaine.

## BACKGROUND

This case involves cocaine distribution by Juanita Michelle Harris (J. Harris) a/k/a "Shell" a/k/a "Cuz" a/k/a "Cousin." Between 5/3/06 and 5/16/06, APD DEU made three controlled cocaine buys from J. Harris, using a Cooperating Source (CS) and recorded money. Observations during the investigation indicate that J. Harris is staying at the residence located at 10270 Tartan Circle. I am seeking a search warrant for 10270 Tartan Circle as well as J. Harris' vehicle, a 1999 Chevrolet Tahoe, EJT-630.

## FACTS AND OBSERVATIONS:

1.  In early November of 2005, APD Ofc. R. Rhodes conducted an investigation involving CS. As a result of Rhodes' investigation, CS is subject to prosecution for possession of a crack stem as well as distribution of cocaine, for which CS has not yet been charged. After confronting CS with the results of his investigation, Rhodes recruited CS as a cooperator. CS is a long term cocaine user and is cooperating with law enforcement in an effort to gain consideration for CS' crimes. APSIN shows CS has a 1997 conviction for robbery 1st, a 1995 misdemeanor conviction for damage to property, and two counts of shoplifting from 1994.

2.  CS has assisted me in several cocaine investigations. As a result of CS' cooperation, I have obtained evidence which I anticipate will support cocaine distribution charges against five people. I have found CS to be reliable.

3.  In mid March of 2006, APD DEU conducted a controlled cocaine buy from a Known Suspect wherein J. Harris arrived and appeared to deliver to the Known Suspect, who in turn delivered approx 11.8 grams of cocaine base to CS. CS later advised that CS could buy cocaine directly from J. Harris, and on 4/6/06, I showed CS a Lineup including the OL image of Juanita Michelle Harris. CS identified the image of Juanita Michelle Harris as "Cuz."

4.  On 5/2/06, CS called and told me that J. Harris had called last night at midnight, and that the two had discussed the availability of cocaine for sale. CS told me that J. Harris advised that many of her customers were

Affidavit of G.K. Dorr

EXHIBIT "C"    Page 4 of 11

Page 4 of ____ Pages

000028

APD 06-19905

social security recipients and that she expected to have cocaine available for CS on 5/3/06, which would coincide with social security checks.

5.  On 5/3/06, I planned and briefed a wired controlled half ounce cocaine buy from J. Harris, using CS and recorded money. As planned, Det. Doll was to drive CS to and from the meet location in a DEU vehicle, and remaining team members were to follow J. Harris from the deal. Doll strip searched CS and found no contraband. Doll fitted CS with a wire. Doll searched the DEU vehicle and found it clear. Doll provided CS with $650 in recorded money as well as a set of digital scales. Team members then set up in the area of the meet. We departed DEA at approx 1734, with me following Doll and CS in the DEU vehicle. We arrived at the meet location and parked at approx 1746.

6.  At approx 1755, CS called for J. Harris at 744-7209, leaving a recorded message requesting a return call. At approx 1805, CS received an incoming call from J. Harris. CS ordered a half ounce, hard. The two discussed the price as $650, and CS advised of her location for the meet. J. Harris advised she would arrive within 8 minutes. At approx 1813, CS received an incoming call from J. Harris, confirming CS' location.

7.  At approx 1822, J. Harris arrived in the lot driving her Tahoe, EJT-630. J. Harris called CS and parked. CS walked from the DEU vehicle and joined J. Harris and a small child in J. Harris' Tahoe. We monitored and recorded as the two discussed the deal, with CS instructing J. Harris to count the money. When J. Harris produced the cocaine, we heard CS decline it, as it was in powder form, and CS had specified hard. J. Harris offered to run to Dowling to get hard, and would return in 15 minutes, with CS agreeing to wait. CS then got out of J. Harris' Tahoe and returned to the DEU vehicle to wait for J. Harris' return. Doll and I remained in the lot watching CS while remaining team members followed J. Harris from the lot. J. Harris again called CS and confirmed CS was willing to wait. Team members reported that they followed J. Harris to a residential address for a brief visit, and then to a restaurant, where she appeared to buy food. J. Harris left the restaurant and drove to the Fred Meyer at 2300 Abbott Road where she made contact with the male driver of a white Chrysler, EYF-669. The driver of the Chrysler was later identified. APSIN shows EYF-669 is registered to Rental Car Finance Corp. Team members reported following J. Harris as she drove back to the meet location, arriving at approx 1924 and parking to the South of CS in the DEU vehicle. We watch as CS gets out of the DEU vehicle and joins J. Harris in the Tahoe. We monitor and record during the deal, to include CS again instructing J. Harris to count the money, and asking J. Harris if her money

APD 06-19905

is straight, as well as conversation with the child. Additionally, J. Harris gave CS food from the restaurant. With the deal apparently complete, CS gets out of J. Harris' Tahoe and returns to the DEU vehicle. Doll then joined CS in the DEU vehicle, and drove back to DEU, with me following.

8.    Back at DEA, Doll and CS got out of the DEU vehicle and told me that the scales and suspected crack cocaine were in the center console. I recovered the scales and a quantity of suspected cocaine base in knotted plastic from the vehicle. I then searched the vehicle and found no contraband other than the previously mentioned suspected cocaine. Doll again strip searched CS and found no contraband. Using an ODV, Inc. #904B cocaine salts and base reagent test kit, I field tested the suspected cocaine base and obtained positive results for the probable presence of cocaine. I then packaged the suspected cocaine for submission to APD Property & Evidence section. With a recorder running Doll and I debriefed CS, who described buying the suspected cocaine from J. Harris in a manner consistent with our observations and the wire traffic. CS also reported that the child was present in J. Harris' Tahoe both during the first meet, as well as when J. Harris returned. The suspected cocaine base was later analyzed by the Alaska Scientific Crime Detection Laboratory and determined to be 12.8 grams of cocaine base.

9.    That night, at approx 2335, I drove into the area of 10270 Tartan Circle. The white Chrysler, EYF-669 was parked in the driveway. J. Harris' Tahoe, EJT-630 and a gray Hyundai, DXF-708 were parked at the curb in front of the residence. APSIN shows DXF-708 is registered to two subjects at 10270 Tartan Circle, one of whom is the male identified as driving the white Chrysler. As I pulled out of the cul de sac, a subject wearing a white shirt emerged from the area of the door and walked towards the Chrysler. I departed and drove to Carr's at 1725 Abbott Road to buy groceries. While in the checkout line, I saw J. Harris enter the store wearing a white shirt and realized she was the person I had seen emerge from the area of the door at 10270 Tartan. I went out into the lot and saw the white Chrysler, EYF-669 parked unoccupied. J. Harris eventually emerged from the store carrying a grocery bag. I watched J. Harris get into the Chrysler and drive to another parking space in the lot. J. Harris parked and turned off her lights. I then departed.

10.   The premises at 10270 Tartan Circle consist of the Southern most unit of a brown, two story condominium style building containing four adjacent units. The numbers "10270" are attached to a post on the front porch of the premises. Each unit has a driveway and its own integral garage and exterior man door. Observations at the premises make me suspect that in

Affidavit of G.K. Dorr

APD 06-19905

addition to J. Harris, at least two adults and two children reside here. 10270 Tartan Circle is bounded by Tartan Circle to the Northeast, 10260 Tartan Circle to the Northwest, and Independence Drive to the Southwest.

11.   During the morning of 5/6/06, CS called and told me that during the previous night, CS had been in the area of Boundary and Muldoon and was approached by J. Harris in the Tahoe. In veiled terms, J. Harris inquired as to whether CS needed any cocaine, indicating that she presently had her supply with her. CS declined. This contact was not recorded.

12.   On 5/6/06, at approx 1956, I drove into the area of 10270 Tartan Circle. The white Chrysler, EYF-669 was parked in the driveway, J. Harris' Tahoe, EJT-630 and a silver Dodge Durango, ETN-847 were parked at the curb.

13.   On 5/9/06, at approx 1150, I went into the area of 10270 Tartan Circle. J. Harris' Tahoe was present, as was the silver Dodge Durango and the Hyundai. That evening, I had contact with CS at DEA. I planned and briefed a controlled cocaine buy from J. Harris wherein Doll was to drive CS to and from the deal. Preparations were made, and at approx 1835, and while in the presence of Doll, CS called for J. Harris at 744-7209 and ordered a half ounce, hard. J. Harris told CS that she was on the phone long distance and asked CS to call back in twenty minutes to arrange a meeting place.

14.   At approx 1842, CS received an incoming call from J. Harris, wherein CS and J. Harris set the meeting place as Fred Meyer on Abbott Road. At approx 1917, CS and J. Harris again spoke by telephone, with J. Harris advising an ETA of an hour. At approx 1930, at my direction, CS called J. Harris and advised that CS would go elsewheres for the deal and would be calling again next week. J. Harris agreed.

15.   On 5/11/06, at approx 0735, I went into the area of 10270 Tartan Circle. The silver Durango was parked in the driveway. The Hyundai and a blue motorcycle, 1295RG were parked at the curb in front of the residence. That evening, I planned and briefed a controlled cocaine buy using CS and recorded money. Those present were Lt. C. Stevens, Acting Sgt. A. Kennedy, Det.'s M. Doll, J. Penman, DEA S/A R. Rambo, DEA TFO E. Feliciano, CDSP's S. Paine, R. Houck, V. Ward, and me. While Doll and I recorded, CS called for J. Harris at 744-7209. The first several calls went to J. Harris' voice mail, and CS inadvertently called another number. CS then reached J. Harris. In veiled terms, CS ordered cocaine and the two agreed to meet at Popeye's on Boniface, with a 20 minute ETA.

APD 06-19905

16. I searched the DEU vehicle which CS was to drive to and from the deal and confirmed it was free of contraband. Doll strip searched CS and found CS clear of contraband. Doll equipped CS with a wire. We provided CS with $650 in recorded money and a set of digital scales. Team members set up in the area of the Popeye's on Boniface. Doll and I followed CS as CS drove the DEU vehicle to Popeye's, parking at approx 1832. At approx 1837, I instructed CS to call J. Harris. After a series of telephone contacts between CS and J. Harris, the two agreed to change the meet location to the Sear's Mall. At approx 1937, we moved from the Popeye's lot, with Doll and I following CS as CS drove the DEU vehicle to the Sear's lot, parking at approx 1950. CS then called for J. Harris, who advised she was on her way.

17. J. Harris arrived in the lot driving her silver Tahoe, EJT-630 at approx 2021. J. Harris was again accompanied by a small child. When J. Harris arrived, we watched CS get out of the DEU vehicle and join J. Harris and the child in J. Harris' Tahoe. We monitored the conversation during the deal, to include CS instructing J. Harris to count the money, and asking if she has weights (scales) as well as a discussion of the weight as 15.2 grams. The child is heard in the background. CS chides J. Harris for tonight's delay, and asks J. Harris if the count on the money was straight.

18. With the deal apparently complete, we watched CS return to the DEU vehicle. Team members followed J. Harris out of the lot and away. While following, Lt. Stevens observed J. Harris' face and confirmed her identity. Doll and I followed CS as CS drove from the lot to a location where I instructed CS to park. Doll then joined CS in the DEU vehicle. Doll recovered the suspected cocaine in a cigarette box from CS. Doll searched CS and the DEU vehicle and found no contraband other than the previously mentioned suspected cocaine. Doll debriefed CS, who described purchasing the suspected cocaine from J. Harris in a manner consistent with our observations as well as the wire traffic. CS added that the child from the earlier buy was again present in J. Harris' vehicle. CS estimated the child's age at 2 to 2 1/2 years and advised her name was similar to "Diara." CS also advised that J. Harris handed the cocaine to CS w/in a cigarette box and that the suspected cocaine had weighed approx 15.2 grams. Back at DEA, Doll turned the suspected cocaine over to me, inside a plastic bag further contained within a cigarette box. Using a Nartec, Inc. cocaine test ampoule, I conducted a field test of the suspected cocaine and obtained positive results for the probable presence of cocaine. We packaged the suspected cocaine for submission to APD Property & Evidence section.

Affidavit of G.K. Dorr

EXHIBIT " C " Page 8 of 11

Page 8 of ___ Pages

APD 06-19905

19.    During the evening of 5/13/06, CS called and told me that CS had
       received an incoming call from J. Harris' number that evening, but had not
       answered the call. That night, at approx 2330, I went into the area of
       10270 Tartan Circle. J. Harris' silver Tahoe, EJT-630 and the silver
       Durango, ETN-847 were both in the driveway. I returned the following
       morning at approx 1043, and both the Tahoe and Durango were still
       present the drive way. The Hyundai was parked in the cul de sac, and
       there was a child's bike lying on the lawn.

20.    On 5/15/06, at approx 0734, I went into the area of 10270 Tartan Circle.
       The silver Durango, ETN-847 was parked in the driveway, and the
       Hyundai was parked in the cul de sac, and the child's bike was still on the
       lawn. As I was leaving the area, J. Harris' silver Tahoe, EJT-630 arrived
       and pulled into the driveway behind the Durango.

21.    On 5/15/06, at approx 2255, I went into the area of 10270 Tartan Circle.
       The silver Durango was parked in the driveway. J. Harris' silver Tahoe
       and the motorcycle were parked at the curb in front of the residence. The
       following morning, at approx 0703, I went back into the area. J. Harris'
       silver Tahoe, the motorcycle, and the Hyundai were all present, with J.
       Harris' Tahoe appearing to be in the same location as last night. The silver
       Durango was in the driveway. At approx 0800, I heard from CS, who
       advised J. Harris had called this morning and inquired as to whether CS
       needed anything, and indicated that she had cocaine for sale. This contact
       was not recorded.

22.    On the evening of 5/16/06, I had contact with CS at DEA. I planned and
       briefed a half ounce controlled cocaine buy from J. Harris using CS and
       recorded money. As planned, CS was to drive a DEU vehicle to and from
       the deal. I searched the DEU vehicle and confirmed it was clear of
       contraband. Lt. Stevens strip searched CS and found no contraband. Lt.
       Stevens fitted CS with a wire. In the presence of Det. Penman and I, CS
       called for J. Harris at 744-7209 and left a recorded request for a return call.
       With no call-back, I again had CS call for J. Harris, which also went to
       voice mail. I instructed CS that in the event J. Harris called while Penman
       and I were out of the room, not to answer her call, but to notify me and we
       would then return the call, while recording. Penman and I then stepped
       out of the room. Approx 15 minutes later, CS called me and advised that
       CS had just received and incoming call from J. Harris' number which CS
       did not answer, but that while attempting to call and notify me, CS
       inadvertently answered a second incoming call from J. Harris and told J.
       Harris that CS would call right back, and then had notified me. That brief

Affidavit of G.K. Dorr



EXHIBIT " C "    Page 9 of 11
Page 9 of _____ Pages

APD 06-19905

contact was not recorded. In our presence, CS then called J. Harris and arranged to meet at Sears/Carrs in 20 minutes. I provided CS with $650 in recorded money for a half ounce of cocaine and a set of digital scales. CS then returned another missed call from J. Harris, wherein J. Harris asked CS words to the effect of "...what you got?" with CS telling J. Harris that CS had $650. Team members were sent into the area of the Sears/Carrs mall. Lt. Stevens and I followed CS as CS drove the DEU vehicle towards the Sears /Carrs mall. While underway, at approx 1752, we monitored CS receiving an incoming call, which I recorded, with J. Harris apparently telling CS that there would be a delay, as J. Harris was getting her hair done. CS asked J. Harris to do the deal prior to J. Harris' hair appointment. We arrived at Sears/Carrs, parking at approx 1800. Between 1800 and 1952, CS and J. Harris engaged in a series of brief telephone calls regarding J. Harris' ETA and location. At approx 1952, J. Harris asks CS to move to the Barnes & Noble parking lot. After members of the team moved into the Barnes & Noble lot, I instructed CS to park in the Barnes & Noble lot, and to call J. Harris. Stevens and I followed CS as CS drove the DEU vehicle into the Barnes & Noble lot. Team members advise seeing J. Harris' Tahoe moving through the lot and adjacent streets. We monitor and record as CS and J. Harris keep an open telephone line while trying to locate each other. CS then got out of the DEU vehicle and joined J. Harris in J. Harris' Tahoe. As J. Harris drives through the lot with CS as passenger, we monitored and recorded during the deal including J. Harris telling CS that she suspected several nearby vehicles to be undercover police. J. Harris chided CS for naming their meeting location over the telephone. After a silence, CS is heard asking J. Harris "straight?" which I interpret to be CS asking J. Harris for confirmation that the count of the money is correct. As CS gets out of J. Harris vehicle and is walking back to the DEU vehicle, CS advises that J. Harris has given CS a McDonald's box and that the cocaine should be inside the box. Lt. Stevens and I follow CS as CS drives the DEU vehicle back to DEA. Lt. Stevens rejoined CS and recovered a McDonald's Happy Meal box from the DEU vehicle, and showed me the contents, which included a clear plastic toy bag which further contained suspected cocaine w/in a knotted plastic bag. Penman searched the DEU vehicle and found it clear of contraband. Stevens again strip searched CS and found CS was free of contraband. With a recorder running, I debriefed CS, who described buying suspected cocaine from J. Harris in a manner consistent with our observations, as well as the wire traffic. CS added that the infant from the two previous buys was not present. Using a Nartec, Inc. cocaine test ampoule, I conducted a field test on the suspected cocaine and obtained positive results for the probable presence of cocaine. VonDolteren and I packaged the suspected cocaine for submission to APD Property & Evidence section.

Affidavit of G.K. Dorr

APD 06-19905

I took photographs of the Happy Meal box and contents which included a partially eaten burger, a juice, a wrapper, and some chips. I packaged the Happy Meal box for submission to APD Property & Evidence section and discarded the contents.

23. Later that night, approx 0110, I went into the area of 10270 Tartan Circle. J. Harris' Tahoe, EJT-630, the Hyundai, and the motorcycle l were parked at the curb, and the silver Durango was parked in the driveway. I returned at approx 0731, and saw J. Harris' Tahoe and the Hyundai were still present.

24. In light of the above, there is probable cause to believe that a search of the premises at 10270 Tartan Circle will yield items listed on Attachment "A." I ask the court to grant APD authority to search 10270 Tartan Circle for the items listed on Attachment "A," at any time of the day or night.

25. In light of the above, there is probable cause to believe that a search of J. Harris' silver 1999 Chevrolet Tahoe, EJT-630 will yield items listed on Attachment "A." I ask the court to grant APD authority to search of J. Harris' silver 1999 Chevrolet Tahoe, EJT-630 for the items listed on Attachment "A," at any time of the day or night.

26. I further ask the court to relax the provisions of Alaska Rule of Criminal Procedure 53 to dispense with the requirements of leaving a copy of this affidavit with the persons involved. Should they or others associated with them learn the content of this affidavit, I believe that the investigation would be prematurely terminated. Additionally, the safety of CS could be compromised.

27. Further, I ask that this authorization and the underlying affidavit be sealed by the court in order to prevent unauthorized people from seeing the authorization and affidavit.

G.K. Dorr, Detective, APD

Subscribed and sworn to or affirmed before me
on this 7 day of May, 2006.

Judge or Magistrate

EXHIBIT " C "
Page 11 of ____ Pages

000035

Attachment "A"                                                 06-19905

**controlled substances:** cocaine in any form; materials commonly used as cutting agents for cocaine such as inisitol, boric acid, creatine, lactose, lidocaine, procaine, mannitol, aminopyrinne, and caffeine; materials and equipment used for converting cocaine hydrochloride into cocaine base such as baking soda, Pyrex brand glassware or other heat resistant glassware.

**paraphernalia for packaging and distribution:** materials and equipment commonly used for packaging and distribution of cocaine such as scales, grinders, sifters, vacuum sealers, heat sealers, and kilogram presses; packaging materials such as plastic wrap, kilogram wrappers, baggies, bags, glass or plastic vials, paper bindles, foil bindles, and envelopes; papers relating to shipping of cocaine or money such as UPS, DHL, USPS, and FedEx air bills, labels, parcel tracking documents; and shipping materials.

**paraphernalia for use:** cocaine paraphernalia including but not limited to glass pipes, stems, and other pipes used to smoke cocaine; straws and devices used for inhaling cocaine; spoons, mirrors, razor blades, vials, propane torches; and stash containers.

**items relating to illegal transactions and the laundering of drug proceeds:** cellular telephones, to include the telephone to which the number 744-7209 is assigned, as well as electronic data stored w/in that phone; telephones; pagers; computers; documents relating to illegal drug transactions, money paid, wired, transferred, deposited, received, and owed; customer/source lists, including names addresses, and telephone numbers; records relating to airline travel such as airline tickets and travel itineraries; business records; account books or ledgers; checks; banking records; safe deposit box keys; tax returns and other tax records; telephone records; address and telephone books; recordings and/or photographs showing use or distribution of any controlled substance.

**items showing ownership, possession or control:** any documents or items tending to show ownership, possession or control such as keys, telephone and utility bills, lease, rental or sale agreements or contracts, credit cards or credit card receipts, mail, bills; any documents or items pertaining to vehicle ownership or control, including but not limited to vehicle registrations, titles, bills of sale, vehicle repair orders or invoices or emissions control inspections.

**firearms:** any firearm which is visible, carried during or used in furtherance of a violation of AS 11.71, as well as any firearm possessed by a convicted felon.

**proceeds of drug trafficking:** money, notes or other items of value used in or intended for use in or derived from drug trafficking.

ORIG.

AO 106 (Rev. 7/87) Affidavit for Search Warrant

# United States District Court

## DISTRICT OF Alaska

In the Matter of the Search of

(Name, address or brief deposition of person, property or premises to be searched)

A 2001 Dodge Durango
Vehicle Identification Number
(VIN) 1B4HS38N72F184347
Silver in color

**APPLICATION AND AFFIDAVIT
FOR SEARCH WARRANT**

CASE NUMBER: 3: 06 - mj - 00159

I TFO Mikell Von Dolteren _____ being duly sworn depose and say:

I am a(n) DEA Task Force Officer _____ and have reason to believe

that ☐ on the person of or ☒ on the property or premises known as (name, description and/or location)
A 2001 Dodge Durango, silver in color,
Vehicle Identification Number (VIN) 1B4HS38N72F184347

in the_____ District of Alaska _____

there is now concealed a certain person or property, namely (describe the person or property to be seized)
See Attachment "A"

which is (state one or more bases for search and seizure set forth under Rule 41(b) of the Federal Rules of Criminal Procedure)
1. Evidence of a criminal offense. 2. Contraband, fruits of a crime, or things otherwise
criminally possesed. 3. Property designed or intended for use in a criminal offense.
concerning a violation of Title 18 & 21 _____ United States Code, Section(s) 924(C)(1)(A)(i) & 841(a)(1) _____.
The facts to support a finding of Probable Cause are as follows:

See Attached Affadavit of TFO Mikell Von Dolteren

Continued on the attached sheet and made a part thereof:      ☒ Yes  ☐ No

_____
Signature of Affiant

Sworn to before me, and subscribed in my presence,

July 31, 2006 _____
Date

at Anchorage, Alaska _____
City and State

Philip M. Pallenberg, U.S. Mag. Judge
Name and Title of Judicial Officer

_____
Signature of Judicial Officer

**EXHIBIT D**

Page 1 of ___ Page

000008

**AFFIDAVIT OF DEA TASK FORCE OFFICER MIKELL VON DOLTEREN**

Background and Experience

1.      I have over eight (8) year's law enforcement experience with the Anchorage Police Department. I am currently assigned as a Task Force Officer with the Drug Enforcement Administration (DEA). My duties include the investigation of cases involving controlled substances, and associated financial crimes, such as money laundering.

2.      I graduated from the Anchorage Police Department's training academy in 1997. The training academy lasted 5 months, and included specialized instruction on devices, paraphernalia, techniques and practices used by individuals engaged in the use, possession, manufacture, and trafficking of controlled substances. As part of the certification process to become a police officer, I completed three months of field training under the direct supervision of APD Field Training Officers. This field training included the investigation of crimes involving the use, possession, manufacture, and trafficking of controlled substances in the Anchorage area.

3.      In June of 2002, I attended the two week Basic Drug Investigation Course taught by the Drug Enforcement Administration (DEA). During this training, I learned about the devices, paraphernalia, techniques, materials, and practices used by individuals engaged in the use, possession, manufacture, and trafficking of controlled substances. Specific emphasis was given to methamphetamine, marijuana and cocaine. I am currently assigned to investigate violations of the federal controlled substance laws, that is, violations of Title 21, United States Code, Sections 841(a)(1), et seq.

4.      In July of 2003, I attended a one week (35 hour) Financial Investigations Practical Skills (FIPS) training taught by the National White Collar Crime Center. This course was a combination lecture and practical application of white collar crime concepts, trends and investigative techniques.

5.      In May of 2005, I attended the DEA Clandestine Laboratory Investigation & Certification course in Quantico, Virginia. During this course I learned the procedures for investigating and dismantling clandestine laboratories in accordance with OSHA and EPA regulations. Under the supervision of DEA chemists, I participated in the manufacture of methamphetamine using two different manufacturing methods.

6.      In September of 2005, I attended the DEA Clandestine Laboratory Site Safety Officer course in Quantico, Virginia. This course included specialized instruction in the initial assessment of clandestine laboratories, using air sampling equipment in toxic atmosphere testing, identifying the lower explosive limits, exposure levels, and determining the level of protective gear.



7.     I received a Bachelor of Science degree in Occupational Education from Wayland Baptist University and a Master of Science degree in Criminal Justice from Boston University.

8.     During my tenure at APD, I have conducted and/or been approximately 70 or more cases involving illegal drugs, which includes to service of search warrants for controlled substances, and the seizure of controlled substances. I have worked as an undercover officer, and assisted other undercover officers in purchasing controlled substances.

9.     In my experience, I have found that the distribution of cocaine is frequently a continuing activity over months and years. Persons involved in the trafficking of illegal controlled substances typically will obtain and distribute controlled substances on a regular basis, much as a distributor of a legal commodity would purchase stock for sale. Similarly, such drug traffickers will maintain an "inventory" which will fluctuate in size depending upon the demand for and the available supply of the product. It has been my experience that drug traffickers keep records of their illegal activities not only during the period of their drug trafficking violations but also for a period of time extending beyond the time during which the trafficker actually possesses/controls illegal controlled substances. The records are kept in order to maintain contact with criminal associates for future transactions and so that the trafficker can have records of prior transactions for which the trafficker might still be owed money or might owe someone else money.

10.    I have participated in or executed at least seventy search and seizure warrants with respect to the manufacture and distribution of controlled substances and the investigation of money laundering. I have supplied information to support affidavits and/or sworn to affidavits for search and seizure warrants in these investigations. These search and seizure warrants have authorized the search of locations ranging from the residences and vehicles of drug traffickers and their co-conspirators to houses and structures used for the manufacture of controlled substances; and the seizure of drug-related assets pursuant to Title 21, United States Code, Section 881. Items searched for and recovered in these locations have included cocaine, methamphetamine, heroin, marijuana, US currency, precious metals, financial instruments, bank accounts, stock portfolios, money market accounts, airlines tickets and/or printed itineraries, money orders and their receipts, parcel service receipts, wire transfer receipts, telephone and address books, cellular telephones, pagers, calling cards, caller ID units, computers, handwritten drug ledgers/pay-owe sheets, handwritten notes regarding travel itineraries and confirmation codes, handwritten notes regarding courier instructions, handwritten notes regarding names and telephone numbers of criminal associates, receipts for distribution paraphernalia, luggage tags from prior airline trips, photographs/videos showing co-conspirators, associates, drugs, money and/or weapons, fraudulent identification, birth certificates or Baptismal records showing real and/or false names, firearms and ammunition. In my experience, drug traffickers keep the above items in their residence, their vehicles, or storage lockers.



EXHIBIT " D "
Page 3 of ____ Pages

11. The information contained below is from personal knowledge, other law enforcement agents, or specific sources as set forth.

The Underlying Investigation

12. On July 20, 2006, Gerald H. Drew was indicted by the Grand Jury for the United States District Court, District of Alaska in the 9th Circuit, for multiple violations of Title 21 and Title 18. Among other charges, Drew was indicted for conspiring to distribute controlled substances between on or about March 2006 and on or about May 18, 2006. The Indictment also alleges that Drew possessed seven firearms in furtherance of drug trafficking crimes.

13. On July 27, 2006 at approximately 6:30 p.m., Gerald Drew was located inside Fred Meyer store on Abbot Road in Anchorage, Alaska. During the arrest and search of Gerald Drew, Detective Alvin Kennedy retrieved a bindle of cocaine base (crack cocaine), a bindle of powder cocaine, and a set of vehicle keys from the right front pocket of Drew's pants. Attached to the vehicle keys was a small plastic placard with "Silver 2002 Dodge Durango" written in dark colored ink.

14. The bindle that contained crack cocaine consisted of several individual crack rocks, that, based on my training and experience, was packaged for resale.

15. Gerald Drew admitted to Detective Kennedy that the key retrieved from his pocket were keys to the vehicle that he had driven to Fred Meyer and that the vehicle contained firearms. A 2001 Dodge Durango, Vehicle Identification Number (VIN) 1B4HS38N72F184347 was located in the parking lot. The keys that Drew was carrying fit that vehicle. The vehicle was taken back to the Drug Enforcement Administration District Office pending this application.

16. Lt. Caroline Stevens, Anchorage Police Department Drug Enforcement Unit Commander, drove the Dodge Durango back to the DEA Anchorage District Office building from the Fred Meyer store on Abbot Road. She stated to Detective Kennedy that the interior of the vehicle had a strong odor of smoked marijuana.

17. Based on the above information, I believe there is probable cause to issue a search warrant to search 2001 Dodge Durango, Vehicle Identification Number (VIN) 1B4HS38N72F184347 for evidence of unlawful possession of a controlled substance with intent to distribute, in violation of Title 21, United States Code Section 841(a)(1), amongst other violations. In my experience, such evidence includes the items set forth in Attachment A. Accordingly, your affiant requests authorization to search the target premises for items more particularly described in Attachment A.

EXHIBIT " D " -
Page 4 of ___ Pages

000011

FURTHER YOUR AFFIANT SAYETH NAUGHT

Detective Mikell VonDolteren
Drug Enforcement Administration

SUBSCRIBED AND SWORN TO before me this 31st day of July 2006, in Anchorage, Alaska.

United States Magistrate Judge

EXHIBIT " D "
Page 5 of _____ Pages

## ATTACHMENT A
## PROPERTY TO BE SEIZE

1. Controlled substances, including cocaine.

2. United States currency, foreign currency, precious metals, jewelry, stocks, bonds, money orders, certificates of deposit and cashiers checks

3. Items evidencing the expenditure of drug related proceeds, namely; receipts, purchase agreements, vehicle titles, warranty applications, homeowners or renters insurance application and claims, photographs and/or video recordings of luxury items, jewelry, expensive vacations.

4. Account statements, account summaries, credit card statements, banking deposit slips, handwritten notes containing account information, account holder and amount deposited, money market accounts, overseas banking information to include routing codes, deposit receipts, canceled checks, loan agreements and loan applications.

5. Safe deposit box keys and agreements and commercial storage locker keys or records.

6. Wire Transfer documents, receipts and handwritten notes containing wire service tracking numbers, amounts sent and intended pay-out locations.

7. Cellular telephones, caller ID units, pagers, pre-paid long-distance cards, telephone answering machine tapes and computers (computers will not be searched without obtaining an independent search warrant following seizure).

8. Printed flight itineraries, passports including visas, airline tickets, airline ticket receipts, pre-printed airline luggage tags, handwritten notes containing airline confirmation codes, frequent flyer mileage plan cards and summaries, business cards from other areas, hotel receipts and car rental agreements and receipts.

9. Items tending to establish the use and/or possession of fraudulent identification documents, namely; birth certificates, Baptismal records/certificates, passports, driver's licenses, State issued identification cards, INS Resident Alien cards, Social Security cards

10. Items tending to establish the identity of the persons in control of the vehicle where the cocaine is manufactured/distributed and/or where the money is stored, converted and/or prepared for transport, namely; utility company receipts, mortgage or rent receipts, canceled mail, envelopes, keys, telephone bills, charge card receipts/statements, lease-rental or sale agreements or contracts, gas receipts, notebooks, photographs, videos, savings account passbooks, passports, diaries, notebooks, vehicle registrations and titles, land titles, escrow papers, legal documents, medical records, weapons with serial numbers, and papers denoting monetary amounts received from the distribution of cocaine, personal clothing including shoes, pants and shirts.



EXHIBIT "D"
Page 6 of ____ Pages